Mr. Burnham for the Appellants, Mr. Butchart for the Appellees. May it please the Court, this is a very narrow dispute. The District Court agreed with the Press Secretary that Mr. Karem made, as the District Court put it, an allusion to a physical application in the Rose Garden. The Press Secretary's decision to suspend Mr. Karem's hard pass after that for 30 days did not violate due process for two basic reasons. First, every credentialed White House reporter, including Mr. Karem, knows perfectly well that they are not permitted to engage in unprofessional behavior on the White House grounds. And second, this Court's decision in Sherriff does not require that the White House give reporters ex ante notice of prohibited conduct. It only requires a proper process, which Mr. Karem received here. I'd like to start, if I may, with what I think is the fundamental dispute between the parties, and that is this. There has always been an enforceable requirement that reporters with hard passes behave in a professional manner on the White House grounds. It is simply inconceivable to me that the Press Secretary would be powerless to take action if, for example, a reporter sexually harassed members of the White House staff, or shouted racial epithets at a guest at an event, or something like that, simply because the White House had not thought to specifically prohibit such egregious conduct through a prospective ex ante rule before it happened. Mr. Karem, on the other hand, argues that there's no standard at all, and that the Press Secretary would be powerless in such situations. And that's best captured, I think, in JA 839 to 840, where Mr. Karem argued that the Press Secretary couldn't take action against a reporter who mooned the President during a press conference, unless that sort of behavior had been prohibited in advance. I think that's clearly incorrect. Here, and that's confirmed by the fact that here, everyone knew that Mr. Karem's behavior was out of line, including Mr. Karem himself. So, even though, as the District Court found and the Press Secretary found, Mr. Karem proposed a physical altercation, whether seriously or as a joke, I think, is sort of beside the point, Mr. Karem, in his submission to the White House, did not grapple with what he actually did. Instead, he offered the totally disingenuous explanation that when he asked Mr. Gorka to go outside and have a long conversation, what he meant was, let's go for a nice stroll in Lafayette Park and talk about politics, and it will be a really nice conversation. Mr. Karem, can I ask you this question? Of course. On the issue of whether it matters whether the statement about the altercation, and let's just put aside everything else for the moment, that particular statement, whether it was stated in jest or whether it was serious, would it be different, suppose that somebody comes up to a reporter, and the person who comes up to the reporter is not a reporter, it's a guest at a White House event, and makes a statement about an altercation, and suggests that you're part of the media, I have problems with the media, and I don't like the way that you're acting, let's take it outside. And then the reporter, in jest, responds, oh yeah, sure, let's take it outside. And everybody understands that the reporter is joking in response. Is that a basis for saying that it's such a clear breach of professional decorum, that we don't even have to get into gray areas here, it's the equivalent of harassment or showing up on mooning, the kinds of obvious ones that you've identified. Sure, I guess I have two points, Your Honor. First, I think the main point is that whether it's in the black area or the gray area, either one is a possible subject for a sanction, like the one that was imposed here in the press secretary's discretion, because the professionalism standard applies, which I think the question sort of presupposes, and at that point it's just a question of whether the press secretary finds that certain conduct has violated it. And in that respect, I think adjudication is, you know, adjudicators routinely clarify the ex-ante standard, in which case professionalism, through applying it to specific conduct, you know, in an adjudicatory proceeding like the one here. So the way this court put it in Quest Services Court v. FCC is that, quote, clarifying the law and applying that clarification to past behavior are routine functions of adjudication. I think the case that really captures this well is the Supreme Court's decision in Rogers v. Tennessee, which, of course, is a much more serious case in the sense that it was about the common law definition of murder, and so it involved a member of the public, it involved his life or liberty, and the question was whether the Tennessee Supreme Court could substantively change the common law definition of murder in an adjudicatory proceeding after the conduct, the thing that was murder or not, had happened. And what the Supreme Court said is that they could, and that the person could be prosecuted for murder under the newly clarified law because the change is not, quote, prior to the conduct in this unit, that's at page 5. What I was trying to get to is the doctrine that you invoked in your brief, understandably, in Reliance on a Holder v. Humanitarian Law Project, to the effect that if you're dealing with a realm in which vagueness considerations are in play, as the district court reasoned in its decision, then one argument that you marshal in your support is that when you're talking about a realm in which vagueness considerations are in play, it doesn't matter whether the standard could be considered vague in certain applications if it's clearly breached in the particular application at issue. And the reason I asked the question I did is because you can imagine situations in which even a joking statement about an altercation, if you think that's out of bounds no matter what, it just seems to me that there's context in which it actually wouldn't be clearly out of bounds no matter what, depending on how it arose. No, I don't disagree with that, Judge from the Boston. I just think you have to look at those cases in conjunction with the cases about the ex post clarification of rules. And so I agree that it's something, you know, a vague law cannot be applied to something that's far out of bounds. Well, I'll call that the white zone. But what all these cases about adjudication tell us is that the gray zone is fair game. And so I don't need to make my point. Mr. Burnham. Yes, Your Honor. The issue here is whether this is even covered by a rule in the sense of something that could jeopardize someone's hard path. You know, and although Ms. Grisham doesn't rely on the ACOSTA letter, you do in your brief and you point to invocation of norms of professional behavior, that the letter is at least ambiguous as to whether the White House even intended to regulate events other than formal press conferences. It says it's not going to police behavioral events because it thinks that professional norms suffice and that it wouldn't publish rules unless unprofessional behavior occurred and it was forced to reconsider its decision. And so at least one way of reading that is, you know, my boss could be called, I could be talked to that I was violating a professionalism norm and that, in fact, the White House might create a rule if that happened. But the notion of going from there all the way to the suspension of a press pass is, one would almost read the ACOSTA letter as creating a bit of a safe harbor on what you're calling the gray areas. So a couple of responses, Judge Pillard. So first, I mean, that's why I started with what I think is really the fundamental point, which is that these norms that professionalism governs at the White House, regardless of whether the White House has published anything. And I think if you read the ACOSTA letter, its premise is that professional journalistic norms and their presences will suffice to regulate conduct in those places. And so I think what they're saying there is that we hope the longstanding professionalism standard is sufficient to govern how reporters behave outside the context of press events. And the letter is just reiterating that. But this is a big mischallenge. And the fact, isn't it relevant that nobody who has shouted at the president or jostled another journalist or done things that one might, under your reading, see as clearly unprofessional has ever had a press pass suspended? So the norm, I guess what I'm saying is that where is there an understanding that those norms are tied to the consequence that Mr. Karam's efforts here? In two respects, Judge Pillard. So first, the examples you cite are the examples from Mr. Karam's declarations. None of those are remotely similar to the conduct Mr. Karam engaged in here. Reporters jostling for prime position at a press conference is categorically different from somebody proposing a fight in the Rose Garden, insulting guests. And on the insulting guests point, I just want to be clear, Mr. Karam says in his speech multiple times that the district court found he would not insult anybody, and that's just not true. And if it were true, it would have been clearly erroneous. Because when Mr. Gorka is walking away, Mr. Karam shouts after him to go home and get a job. Shouts that are unquestionably insulting under any construction up here. I have a question about that, though, because Ms. Christian does not rely on that. She doesn't rely on the go-home-get-a-job. She relies on the whole course of conduct, including Mr. Karam's efforts to escalate it. She focuses more on what she views as an initial insult, that this is a group eager for demonic possession. But I don't think the court can splice these. I mean, the whole thing was before her. She analyzed the whole thing. She relied on all of it, and I think her decision is clear about that. One of the answers of the previous— She did mention they go home and get a job. I'm sorry. Yes, Your Honor, absolutely. Because she recounts the whole incident in painstaking detail and relies on all of it. And just to answer your last question about where this standard comes from, Mr. Karam himself acknowledges that this standard applies. So I think one of the most important documents in the case is his statement to the White House, which is at JA 135. And I think it's a key document for two reasons. First, he offers the completely disingenuous explanation for his statement to Mr. Gorka that he just wanted to have a conversation, which demonstrates clear consciousness of guilt that if he had been proposing to fight, that would be inappropriate. And we know that it's consciousness of guilt because he says it. What he says, and these are his words, is, quote, who would invite someone to a WWF smackdown in the White House Rose Garden in front of 200 people, dozens of television cameras, end quote. The answer, of course, is that Mr. Karam would, as both the press secretary and the district court both found. The district court found that he did it as a joke, but that doesn't mean that that is still not consistent with Mr. Karam's own explanation. I think that's significant because it tells us that Mr. Karam knew what he did was wrong. That's why he offered an implausible and disingenuous explanation of it. And I think the fact that he offered a disingenuous explanation for it is itself a basis for the sanction that the press secretary imposed. As the press secretary's final decision explains. One of the things she says is, look, you know, your counsel has said, maybe I should just give you a written warning. And maybe that would have been enough, except I can't, because you haven't even come here and grappled with what actually happened. Instead of saying, you know, I lost my temper or I was out of line or it was a chaotic event and I didn't think it was inappropriate, but, you know, I won't do it again. Instead of any of that, Mr. Karam offered this ridiculous explanation that what he wanted to do was go give it, you know, walk over to Old Ebber with Mr. Lorca and talk about his podcast. So I just think when you take all that together, it both confirms that there is a standard, it confirms that Mr. Karam knew the standard applied, and it provides an independent basis for the sanction that was imposed, which is Mr. Karam's disingenuousness. Mr. Burnham, can you hear me? Please, Judge. I want to try to get at Judge Gillard's question in a different way. Assume for purposes of my question that the professionalism standard is acceptable, and you can even assume that Karam's behavior was unprofessional. On page 35 of his brief, they cite BMW v. Gore, which says that an individual must receive fair notice, not only of the conduct that subjects him, but also of the severity of the penalty. And they point out that there's nothing in the account letter that talks about, refers to any penalties outside of the press briefing room. In fact, it specifically says that if there is unprofessional behavior, we may need to adopt rules. But unlike for the behavior that exists in the press room, which specifically says that you can use your press pass, there's nothing about that. So their argument is that this conflicts with the BMW v. Gore standard, and I noticed in your brief you didn't respond to that. Would you like to now? Yes, Ron, I'd love to. So I think the one threshold response, and I have a few points I'd like to make, is that BMW is a case about regulating the public. And so what that decision talks about is punitive damages that the court has said were, quote, tantamount to a severe criminal penalty. And so what the court was saying there is you can't prosecute someone criminally, or in that case impose massive civil damages on an entity, unless that entity had notice of the conduct being prohibited and the severity of the punishment. The government's ability to regulate the public, I think, is just categorically different than the government's ability to administer a special program like the hard pass program, where you use this court as an example, this court's membership, and this court's bar. And so to use that as... We have Sheryl, which requires clear and articulated standards. Doesn't Gore say that must include a definition of what the sanction is? So, Judge Tato, I'm glad you asked that, because what Sheryl requires is clear standards applied in the process itself. Sheryl does not say anything about having standards ex ante to the conduct. What Sheryl says is that before you suspend or terminate or deny the pass, you have to tell the person what the standards are, and then let him or her respond, and then listen to that, and then issue a final decision. Sheryl is a purely procedural requirement. Now, here, the press secretary's preliminary decision does have very clear standards in it, much clearer than just the professionalism conduct where we've been talking about. Mr. Barnum, one thing that puzzles me about your treatment of Sheryl is that, in that case, the individual was applying for a press pass, and so the question was, you know, what is the nature of the national security objection made sufficiently clear? So the status quo was no press pass, and the rule had to be sufficiently clear. Here, Mr. Karam had a press pass, and the notion that the standard for taking it away when the only basis was speech by Mr. Karam, and the whole area is obviously, you know, First Amendment protected area, that the clarity there would not need to be announced in advance. I just find that astounding. Of course it has to be announced in advance. You seem to keep it alive, and Sheryl played heavily for the opposite proposition. Yes. That rule, if it is a rule, is not a rule that comes from Sheryl. All Sheryl tells us is that there's a First Amendment-based liberty interest that triggers the Fifth Amendment and thereby requires you to go through a process, in that case, to deny a hard pass. But the logic of the opinion, I think, deeply applies to the revocation of a hard pass. Now, there are background due process principles, obviously, that the court has to grapple with. I'm happy to address those. But just to be focused on Sheryl for one moment. Mr. Byrne, let's go back to Sheryl for a second. I mean, you're right that Sheryl says, Sheryl directs the Secret Service to publish to give a final written statement on the basis of the denial. But Sheryl goes on and upheld the portion of the injunction that required the Secret Service to, quote, publish specific and meaningful standards for the revocation of white house passes. Yes, Your Honor, that's exactly right. And what Sheryl meant by that is standards that would be applied after the preliminary decision and in the process itself. It did not mean- I don't think that's right. The court treats the standards required in the specific case before it. And it does say they have to give a written explanation for that. But then it goes on to say-I'm just reading my notes here-that it sustains the part of the injunction that required the Secret Service to publish explicit standards regarding the revocation of press pass. That's separate from the requirement to explain the revocation of the press pass in the specific case, isn't it? It is, Your Honor, except that those standards are ones that will inherently be applied on an ex post after the conduct basis. I mean, in that case, it was even simpler because it was about background. Really? That's not what it says. In no way does it say, Judge Tatel, I don't think. The court injunction will be applied prospectively to future behavior. That's the purpose of- Yes, of course, Judge Tatel. The requirement will be to promulgate standards as prospective, but it doesn't say that the standards have to be prospective to the conduct at issue. And I think the line that captures this point the best is towards the beginning of Sheryl where they say, the district court determined correctly, we believe, that it had no occasion to pass on the merits of the press pass denial. And that's because the decision doesn't have a substantive component. It's a purely procedural requirement that you tell somebody, look, sir, here's the conduct and the standard that we're thinking about denying or revoking your pass for. What do you have to say about it? Which, of course, happened here. And then the person responds, and then they get the final decision. All the statements about public standards are talking about getting public standards in advance of going through that decisional process. None of them are talking about sort of promulgating a law and avoiding kind of ex post facto issues in a general sense before people engage in the conduct. And just to concretize that a little, a more recent position of this court, I'm sorry, the Supreme Court, Swarthout v. Cook kind of explains this one point where they say, quote, the only federal right at issue is procedural. The role of an inquiry is what process Cook and Cray received, not whether the state court decided the case correctly. And so that, I think, shows you the point I'm trying to make, which is that it's a purely procedural requirement, not a substantive one. But even if the court's not sure about that, and even if the court thinks there does need to be some sort of prospective notice, I think there's two points that show why history of care and suspension was still justified. The first is the point I made to Judge Trimabasum a little while ago about adjudication. And really, I can't rely more heavily on Rogers v. Tennessee, because even if the court thinks that what happened here might be in the gray area, what Rogers v. Tennessee tells us is that it's okay to impose this sanction as long as the evolution in the standard was not, quote, unexpected and indefensible. And in that case, it was a case about putting someone in prison for murder. So the most severe sanction the government can possibly impose, or almost the most severe sanction the government can impose on anybody, as opposed to mere revocation of a hard pass. Another analogy that I think illustrates the point possibly, as we noted in the district court briefing, and I wasn't able to find this court's rules of conduct, but the district court's rule for lawyers is that they won't engage in conduct that offends the dignity and decorum of judicial proceedings. It brings disorder and disruption to the courtroom. Two points on that. First, it is inconceivable to me that before the court's rules were issued, so after the Judiciary Act of 1789, but before that rule was promulgated, I cannot imagine that courts lacked the authority to take action against lawyers who appeared before them and engage in unprofessional and inappropriate behavior. And so I think that kind of illustrates the point that when you're talking about a special access program, because I, of course, am very privileged to be allowed to. I'm not sure about that. I mean, if we in court think that someone is speaking in a confrontational manner or making an inappropriate joke, I'm not sure that it wouldn't raise a similar problem if we tried to ban the person from the court for a month or suspend their bar license. I mean, I think that the kinds of things that the court has the ability to do are to have to keep someone from the courtroom at the moment. But really, do you think that we would have the ability to impose a sanction that goes to that lawyer's ability to practice law with no advance notice, no rule on the books? Well, Your Honor, I think the only part of that I would, the answer would be yes, except I would dispute the part where Your Honor said no advance notice, because I think lawyers know before they're admitted to the bar that one of the obligations that comes with that very special privilege is an obligation to behave professionally. And so I just think that this court sitting, I don't know if the D.C. Circuit was around in 1801, but this court sitting in 1801 would certainly have the authority to tell a lawyer that he can't come back for two weeks if he behaves in an unprofessional manner. Because when I take the oath or I sign the paper to join the court's bar, I understand that that means I have to behave professionally when I'm appearing before the court. Mr. Karam is the same. Mr. Karam is not a member of the public. He's not just somebody who was in the White House that day only. He has a very special privilege of on-demand access to the White House. And I think Mr. Karam knew perfectly well in his statement, which he confirmed that he did, that when he accepted that hard pass, he was taking on an obligation to behave in a professional manner. And then the only other point I would... Interesting. Go ahead and make your other point. No, no, please just go ahead. No, no, please, go ahead. One of the interesting things about this case is the way that people see the same facts and characterize them differently. And you make an aggressive argument in your briefing that the facts have to be accepted as Ms. Gwisham found them. And I think the facts, the district court found the facts that Ms. Gwisham found are essentially the same, and Ms. Gwisham herself says, you know, it's all... And I think your brief says it's on the tapes, so it sort of doesn't matter what the standard is. But you argue that we have to defer to her. And I gather what you're saying is we should defer to her on the characterization of the facts. Is this insulting? Is this a fearless effort to have somebody come fight? Is this, you know, and I guess I'm asking, where do you get the authority for that? And are there any cases that are First Amendment cases where the government actor who is being challenged of having acted in a way that is restrictive of First Amendment freedoms is the decision-maker whose inferences and whose characterizations are final? So I will answer that question. Where are you getting the deference? Where are you getting the deference? How deep do you think it cuts? And is that, how can that be appropriate in the First Amendment context? Certainly. So I will answer that directly. Just give me one sentence before I answer directly. I don't think it ultimately matters because we don't think there are any relevant factual differences between the district court and the press secretary. And we think the suspension is amply justified on either entity's understanding of the facts, which are, of course, all on video, available for review by the court at its convenience. But to answer your question directly, we take that deference concept directly from Cheryl. So what Cheryl says, and this is a quote, is, quote, we anticipate that reviewing courts will be appropriately deferential to the Secret Service's determination of what justifies the inference that an individual constitutes a potential risk. And that's at page 130 of the opinion. I think that is a sensible rule because the whole point of going, it's a little odd to say that they need to go through this entire process of a preliminary decision, a response, you know, a pseudo-hearing, and then a final written decision, if then we're not even going to defer to the facts that are found in that process. I mean, normally we would say, I mean, this is an APA case. The court would be reviewing it for substantial evidence. I see what you're saying. And the thing that I'm wondering about is, doesn't it make a difference that Cheryl is dealing with an individual who has not been cleared as a matter of security? And, you know, the statutory authority here talks about the security of the President and the White House. And, of course, the court is not going to say we know better than the Secret Service on security. Here we have someone who has been cleared, and the question is something that's very familiar to all of us, the question of professional norms. So, I mean, I see where you're getting it from as a formal matter, and Cheryl, but it really seems quite a different context. So, Your Honor, I don't dispute at all that these are practically very different contexts. I guess what I'm saying is that is the legal hook. I think the practical reason why applying a similar rule here makes sense is it's just very odd. It would be very strange to say that the White House has to go through this entire process only to then be subject to de novo review in federal court of all the things that happened in that process, which would be a more demanding review than even a federal agency is subjected to when reviewed under a statutory basis of substantial evidence. Here, all we're talking about is Fifth Amendment due process, which has no substantive component at all. Well, it has a substantive component, but not one that's relevant here. In reviews where they comply with, you know, no depriving someone of life, liberty, or property without due process of law. It's very hard to see where we get out of that general constitutional rule a hook for substantively reviewing the press secretary's decision at all, let alone one that reviews the press secretary's decision without even giving it deference or substantial deference. The other point, Cheryl, that I would like, if you're not sure about the point I just made, is when it describes the standard, it talks about making sure that the denial is not for arbitrary or less than compelling reasons. That is a standard that it talks about in connection with the First Amendment-based liberty interest. So I think even if there was some sort of review, it would only be for arbitrariness on the substantive standard, even if the press secretary's factual findings were not given any deference as a deference matter. And so, you know, either way you slice it, you get to more or less the same place, which is that we're looking at this as an article. Please. I was just going to say that in Cheryl in Part No. 14, we talk about there we're rejecting the notion that the case is non-justiciable because there are no judicially manageable standards for presidential protection. So we are, in fact, reviewing that and rely on, among other cases, the Quaker Action Group case, which dealt with a situation more analogous here because it had to do with just speech activity, you know, demonstrations on the wall. And that's a more familiar standard where when we're looking at First Amendment-protected conduct and activity, we review a determination that an agency decision-maker made to see what the actual basis of it was and, you know, things like in some cases whether it was retaliatory. And so there is a record-making, a valuable record-making rationale, even if deference is not applicable. And I think we see that in our cases, including in the cases that Cheryl set up and the cases that it relies on. Just to be clear, I don't mean to – I certainly don't disagree with your threshold point that security is just very different from what happened here. I guess where I would push back on the implication of the question is just on the notion that deference is not equally due here for legal reasons as opposed to practical judicial competency reasons, given that due process doesn't include a substantive component at all and there's no statutory basis to give the court authority to second-guess the substance of the press secretary's decision. And then my secondary point, which is that even if the court does find that it has the authority and the obligation to do that, the standard would still be a very permissive one, and that is arbitrariness, which I think does come directly from Cheryl. So even if you set aside the security point, I think Cheryl is controlling after that with the notion that it would be at most reviewed for arbitrariness, not sort of the noble view that the court thinks that this is the appropriate sanction at the appropriate time based on this conduct. I also think it's important to point out that Cheryl does not recognize any freestanding First Amendment entitlement on the part of Mr. Caron to be at the White House. All Cheryl uses the First Amendment for is to give rise to the liberty interest that triggers the Fifth Amendment and the procedural protections that go along with that. And, of course, it's back-butter law has been for a very long time that the public has no right of entry to the White House. That's Lemel v. Russ from 1965. And then the Supreme Court has expressly rejected, quote, the proposition that the institutional press has any constitutional privilege beyond that of other speakers, end quote. And that's from Citizens United. So I don't disagree with Cheryl's core holding that once you have a press pass or once you have a press pass program, you must provide Fifth Amendment due process to people who are applying or who have them. But I don't think there's anything in Cheryl or other cases to suggest that there's an independent freestanding First Amendment entitlement to be present in the White House. I'm way over my time. Thank you, Mr. Warren. Let me just make sure my colleagues don't have anything further in their opening argument and then we'll give you your rebuttal. Okay, thanks, Mr. Barnum. Why don't we hear from Mr. Boutros. Good morning, Your Honors, and may it please the Court, Theodore Boutros for the afferly journalist Brian Karam. Before I launch into my argument, I do want to thank the Court for hearing us in these difficult times. The overriding interest at stake in this case, ensuring that the press can vigorously cover the President and the White House, is more important now than ever. We're in a global pandemic, a national crisis, and the American people need accurate information about the government, public safety, and public health. And the issues here go beyond this one case. As the amicus briefs from the Reporters Committee, 44 media organizations, and the White House Correspondents Association illustrate, Mr. Barnum is basically ignoring what this Court held in Sherrill v. Knight, which makes very clear, as the District Court held, that Mr. Karam is likely to succeed on the merits. Sherrill relies on bread-and-butter, void-for-vagueness principles that have been articulated and reaffirmed and expanded by the Supreme Court in cases like FCC v. Fox Television. BMW v. Gore, as Judge Tatel points out, says there has to be fair notice of the conduct that will subject one to punishment and the severity of the punishment itself. And those are just basic due process principles. It's not some just throwaway line. The Court talked in detail about the fact that there must be meaningful, explicit standards published and articulated to tell a reporter what the standards are that need to be met. And in Sherrill, the Court found that the standard articulated that was given, the reason given, reasons of security, was unnecessarily vague and subject to ambiguous interpretation. And that was one of the reasons the Court reversed. Can I ask you this question about the standard, Mr. Beatrice? Yes. So just buy into a few assumptions that I'll lay out. Let's assume that the standard that's being applied is professional journalistic conduct. And let's just say that that's disseminated. I know that you take issue with whether that's an obvious standard that's already out there or whether the ACOSTA letter sufficiently transmitted it, but let's just assume that it has been. And so everybody's only understanding that you have to operate under professional journalistic standards. And is it your position that that standard inherently is so vague that even the most extreme conduct of the kind that Mr. Burnham mentioned and that are in the briefing, for example, harassment, epithets, or a genuine proposition of an altercation, that no action whatsoever can be taken against a reporter who undertakes that kind of conduct and put aside the severity of the sanction? Just I'm saying that standard inherently is so ambiguous that even extreme conduct by a reporter couldn't be an occasion for applying the standard to impose any kind of sanction whatsoever. Your Honor, some of the examples that Mr. Burnham has given and that the government has given involve unlawful conduct, sexual harassment, racial harassment, the mooning example that Mr. Burnham likes to use. As I argued in the hearing with the district court, of course the client has to take action in the moment. And then the question is, what about the future? I'm not so sure about that. Sexual harassment, racial harassment outside of an employment context, those are not torts or subject to criminal law. The mooning is a separate example brought up, I think, originally by the district court here. So I guess I'm wondering, I don't disagree on the bottom line, but I'm wondering how, you know, is it because this is a room in a public forum and so it's in some way, I wouldn't go all the way, but in some ways like an employment setting? Your Honor, I think that's one way to look at it. But going to the vagueness point and the professionalism, the district court noted professionalism is a contextual thing. And here, professionalism is vaguer than reasons of security or indecency like we had in the FCC decision. And it's something that's in the eyes of the beholder. President Trump thinks it's unprofessional, as he made clear just last week, if a reporter asks a critical question or even sometimes a softball question. And so to leave, and the White House Correspondents Association makes this point, to leave the question of whether a reporter acted with professionalism in the hands of the White House press secretary or the president is just a license for discriminatory and arbitrary. So then is the bottom line then that it is that there's no application. Put aside independent violations of law, and then you have to get into what kind of violations of law are we talking about.  Is your view then that there's no conduct by a reporter that could validly be the subject of some response if the overarching standard is professional journalistic? No, Your Honor. In fact, the opposition all along has been that the White House could take various actions, such as calling the reporter in, saying, if you behave like that again, giving them fair notice, fair warning, talking to their employer. And that's how it's always been done. And going to Judge Perard's point, there's never been a suspension based on any conduct relating to this at all. Not even close. There was no fair warning whatsoever. What about a reprimand? What about a reprimand that's publicly voiced? Yes. Yes, Your Honor. In fact, we sort of suggested that we disagree. I think Mr. Burnham is arguing the facts in the face of factual findings, but put that aside. Okay, so if a reprimand is okay, then if we're only talking about suspension, let's just narrow it to suspension then, then is your position that a suspension of any duration is off limits as a per se matter unless the conduct is independently unlocking? Yes, Your Honor. I think without fair notice or fair warning, that particular conduct will give rise. I'm giving you the notice. Right. So the notice is the overarching standard about professional journalistic conduct. And so that's the overarching standard. That's all the notice that's out there. And so your position is that if we're talking about a suspension of any duration, that standard is just inherently vague, and there's no conduct that could occasion the imposition of a suspension of any duration. That's correct, Your Honor. I think, though, that I want to make clear, the Secret Service has other authority. So if a reporter was engaged in ruling racial epithets, doing things that were out of control in a way that could potentially raise a security concern, the Secret Service has a process standard and a 30-day notice and a notice and hearing process where it could take action if it created a sort of risk to the physical. But, Mr. Winters, let me push a little more on that. If you had a contact at press conferences, and I don't think this is the way they do it, but if they passed a microphone around for the reporters to have a chance to speak. I mean, I gather one of the things the Acosta letter was bringing up was, you know, turn-taking. And if you had a reporter who did not let go of the microphone and wanted to just give a monologue and lambaste the president who had appeared for an ordinary press conference. And there was, you know, there was a risk particularly to, you know, the Secret Service wouldn't be stepping in, but it would just be everybody would agree. This is not the way in a group setting journalists behave themselves. And if you didn't have the guidance of the Acosta letter, but just, you know, an adoption by the White House of really expressed professional standards, that's not a violation? Your Honor, that was at least partly the argument in the Acosta case, which Mr. Burnham and I went back and forth on and both handled that. And again, Your Honor, the danger with a standard like professionalism is that it can be invoked with arbitrary and capricious and discriminatory intent. And that's why FCC versus Fox says that in the First Amendment area, we need particularly clear standards. But these due process vagueness standards apply with particular force when we're talking about First Amendment activity. Yes, Your Honor. Let's just continue. Suppose the press secretary tried to flesh out the professionalism standard. And suppose, for example, it said that outside of the press briefing room, when the press is covering events throughout the White House, the press is there to cover the events, but that reporters may not engage with the guests. That that's unprofessional. And that a reporter who does that can lose his or her press pass. Your Honor, I think, one, I think that would be, you know, very unfortunate and a real problem. Those are newsmakers. Well, I wasn't asking you that. Why would that be unconstitutional? That would be a different standard, Your Honor. That would raise a different question. And Judge Contreras noted that, that in the Costa letter, it puts three specific rules relating to Judge Pillard's example, where there's a formal press conference and explicitly said, we're not making the kind of rules that Your Honor is suggesting. I was just asking. It was just hypothetical. So you agree that they could do that. But the problem, from your perspective, at this point, is that they haven't fleshed out what unprofessionalism means. Let me ask you a related question about your reliance on B&W v. Gore. When I asked Mr. Berner about that, he said, well, that case doesn't have any applicability here because that was a criminal case. That is, again, just misguided. It was a civil punitive damage case where the Supreme Court held that those vagueness standards that come from the criminal law apply forcefully in the civil context when punishment is involved. And here, Ms. Grisham was very clear, as the district court found, that this was a punishment, meant to punish Mr. Karam for what he did and her skewed version of it and to deter him and others from future activities. So it's a civil punishment. And, Judge Tatel, when I went back and looked at Fox Television, the FCC case, a vagueness case, the court there found that the fact that one of the media organizations had not even been defined. It had been found to have engaged in indecency pursuant to a vague standard. And the FCC decided not to find it. But because it had announced the find, that had reputational impact. It was a punishment. It was subject to those vagueness standards. So even where there wasn't an actual imposition of a punishment. So Mr. Burnham is just wrong. BMW applies to civil punishments. I thought the point that was being made about Gore was that it was public-facing, not necessarily that it was civil or criminal, but that it was indicating broader public interest because of the nature of penal damages. But if I could just ask, back up for a second, on the question of the overarching standard and the applicability of particular content. Wait a minute. What's his response? I want to hear what he says about what you just asked. What's his answer to your question? The public-facing notion, I think that's completely irrelevant. Punitive damages are civil punishments imposed in cases involving civil litigants. This is much more of a public-facing punishment. This is the White House, the President of the United States, punishing a reporter for engaging in journalistic activities in the White House grounds. That's much more public. That's the government cracking down and punishing a reporter for speech activities. That is much, much more implicating of due process vagueness principles. As Fox Television said, this is a particular rigorous adherence to those principles. So this is a much stronger case. I've been a big advocate in the punitive damage area. This is an even more important area where those vagueness principles and fair notice principles apply. Just to add, Justice Gorsuch, we cited his concurrence in the Maya case where he says this is like the most vital due process protection in civil cases. I tried to smuggle in two questions there. I was rightly asked to answer the first one. Let me ask the second one, which is on the overarching standard and the applicability to particular context, I take the point that if you specify particular applications, there's more notice. But one of the problems with requiring specification of all particular forms of conduct is that there just may be forms of conduct that one just doesn't predict. Then you use the overarching standard as a residual. For example, I don't know that somebody would necessarily have a standard that asks reporters, and I know you're disputing the facts and I know the district judge said it was in a joking manner, but let's just take it outside the particular context of this case. I don't know that you predict that there would be a situation in which a reporter would seriously propose an altercation with a guest at a White House. But yet, if there is an overarching standard of professional journalistic norms, one would think that conduct like that would be swept up within it, even if it wasn't specified. It might not be specified just because you wouldn't expect somebody to genuinely proposition an altercation with a guest. Right, Your Honor. There are some things that would be unpredictable and not governed by specific standards, but that can be dealt with in the future. This isn't some problem that has come up over time that needs to be addressed that can't be addressed in the future. If I can, Your Honor, just address it. You mean by the future, you mean that you can't have a backward-looking suspension for someone who engages even in something that we think is egregious misconduct that's not specified as such. All that could happen is that they could be warned not to do it again. If it was serious enough, Your Honor, the Secret Service could take action. The Secret Service can take action when it has to do with things within the Secret Service's domain. If it's physically threatening a protected person, yes. But I don't know that a guest is. Is it true that the Secret Service protects non-protected persons who are guests? I think, Your Honor, the Secret Service could say that if someone was truly threatening a guest, which the district court found was not correct here and the government is not challenged as clearly erroneous, it could say that would be grounds for considering whether that person is a physical threat to the President. Let's just take it outside the context of something the Secret Service can do, but it's still misconduct, just screaming and yelling ad nauseum and laced with profanity and epithets. It's not independently unlawful, but it's something that obviously breaches professional journalistic norms. The notion that you're proposing is that you just can't have a suspension for that. You can only be warned not to do it again. At least without standards in advance, Your Honor, and warning that something could result in a suspension or revocation of a pass. Could there be standards laid out? Yes. I do want to just briefly address the factual points here because Mr. Burnham and Ms. Grisham rely on their skewed version of the facts. The district court made specific factual findings rejecting what they say. Mr. Karam, he didn't admit that he did anything improper. He said over and over again he was just saying he wanted to talk. He was joking. That's his personality. The district court found he basically made two irreverent, caustic jokes. Then this unruly, raucous, circus-like atmosphere, he was reacting in real time. I don't know how you could have standards that govern something like that. It's so subjective. It's so amorphous. President Trump, for better or worse, creates that sort of atmosphere. I tend to find it fascinating. I'm not even being critical about it, but how in advance could someone know where you have the president calling reporters the enemy of the people and fake news and saying you're a terrible reporter because you asked me a question about what the American people, if they're scared how they should react to this coronavirus, how could anyone know what might be deemed unprofessional without some sort of standard? Your Honor, we understand that the White House needs to be able to ensure some degree of order and regularity and it needs that. There's a built-in tension. Alexander Bickel called it an unruly contest, an adversarial nature between reporters and the White House. That's for the benefit of the American people to get information. If we start having the president and his press secretary determining that they don't like the question, it's too mean, it's too rude. If you look, then that's a real First Amendment danger and that's why Cheryl requires meaningful, explicit standards in advance. And this wasn't even close. Mr. Boucher, this is just a factual question and I looked all through the record, it's a very bizarre statement. This looks like a crowd eager for demonic possession and a lot of people did seem to laugh, but I just found it puzzling. Is there some TV or movie reference that I'm missing? It doesn't seem like an insult, it doesn't seem like a joke, it just seems odd. Is there anything you can say that fills in the context? Not really, Your Honor. Mr. Karam, as we've noted in some of the declarations, by the way, we put in sworn declarations from eyewitnesses. The government didn't put any evidence in. Mr. Karam is known for having this jocular sense of humor, joking and doing Rodney Dangerfield impressions. That was a little spin on his Rodney Dangerfield take. Rodney Dangerfield would say things that were kind of out there. People laughed. He told the joke twice, like a comedian might do, but that's the point. Everybody laughed. Look at the circumstances. The reporters were being taunted. Mr. Gorka started out with his fake news panorama, and people were taunting the reporters, calling them fake news. It was a back and forth. It was an unruly event, as the district court found. But we don't punish that in the United States. This is free speech. That's the carnival-like country we live in. This was after the press event. Mr. Karam had asked the President to answer some questions. He declined. This wasn't like a judicial proceeding. Even you think it could be punished if there were standards set up beforehand? Theoretically. We reserve the right to challenge those standards as vague or improper or arbitrary or discriminatory. By the way, it's not just whether it was arbitrary. Mr. Burnham leaves out the fact that this court in Sherrill said there must be a Is it really compelling that Mr. Karam told a couple of jokes, and then when Mr. Gorka stormed across the White House grounds, it talked to him and engaged in conversation, and then engaged in conversation afterwards with some of the other reporters, where they really talked about journalism. And, again, I want to go back to the factual findings here. This court does not need to defer to Ms. Grisham's factual findings. And Sherrill doesn't say anything like that. And Judge Pillard, you pointed out, this court found it could review the ultimate conclusion of the Secret Service. But here we have disputed facts. The district court rejected Ms. Grisham's analysis. And so we would reserve the right to challenge findings based on standards. But there were no standards. The Acosta letter said we are not imposing standards. Ms. Grisham said in her August 2 letter, we determined not to establish explicit rules, and Sherrill says you have to have explicit rules. That's why we're clearly likely to succeed on the merits. There's no question it's irreparable harm to be denied the ability to cover the White House and go in and do your job. This court's decision in pursuing American greatness, the Supreme Court's decision in Elrod, there's just no question Gordon v. Holder holds that constitutional rights are denied. That's irreparable harm. And so, Your Honors, we believe that the district court got it right here and that there's a likelihood of success on the merits. I'm happy to answer any other questions. I just wondered about on, you know, this is a preliminary injunction. Were we to affirm the case would proceed to the merits, what's your sense of what still would need to be addressed on the merits? What kind of factual development there would be? What are the open issues if the district judge's injunction stands? Well, we, Your Honor, would, you know, I think, you know, would want to take some discovery probably from Ms. Grisham. I think the parties have, I think, in some ways agreed that if the preliminary injunction stands, that may be the end of the case. I think that we've created a very fulsome record here, that factual record, and the government provided no factual record other than the videos, but that was it. So I think we're easily likely to prevail on the merits. If we were to go forward, we would make out an even more fulsome case about the incident on the White House grounds. As Judge Contreras said, we did provide some evidence. We would flesh that out. We would probably bring in other reporters to testify if the case went forward. But I think that, you know, the record is very clear. There were no standards. This is a punishment. There was no fair notice that any punishment could be imposed. The judge found against the government, at least so far, unchallenged factual findings as to what actually happened in the district court, watched the videos over and over again, read the declarations that we submitted, looked at the other evidence. So we would probably expand on that. But I think that the record is just very clear. You can't punish a reporter who has a First Amendment liberty interest that the government isn't challenging under these circumstances. And if I can address one more point, I know I'm over my time. This Rogers case that the government, Mr. Byrne, really puts a lot of weight on it, completely different situation. There, the Supreme Court held that the judicial interpretation, the common law rule of a year and a day for transferring, making something culpable as murder, was a common law updated rule and interpreted a statute. It didn't talk about the conduct of the person who clearly did engage in the conduct that caused the death of the person. So it wasn't a fair notice of the conduct. And it was a judicial gloss on an existing standard. That's just a completely different circumstance here. And the government ignores, doesn't even cite the Fox television case, which is a vagueness case involving free speech. It controls here and it really validates what this court held in Sherrill. I think, Sherrill, were you asking one more question? Just a quick technical question. In his brief, Mr. Byrne says that even if we were to sustain the injunction, it shouldn't run against the president. And you didn't respond to that. Do you agree that if we were to sustain the injunction, it should not run against the president? We, they did have that in the footnote. We didn't address it in our brief. It's something that we want an injunction that constrains the White House and Ms. Grisham and the president from the suspension. So that was something we were, you know, if need be, we'd address it in the district court. But we need an effective injunction that returns Mr. Karam's press pass. I have one last question, which is on one part of the facts that Mr. Byrne flagged, but I don't think we've talked specifically about it, which is the statement to Mr. Gore could go home and get a job. And let me just ask this. If we weren't in a context in which there were any interaction between a White House guest and a reporter beforehand, I know that's not what we have here. I'll stipulate to that, of course. But if we weren't in that context and a reporter just said that to a guest at an event that was covered by the press and in a loud manner, would that be consistent with professional journalistic norms? It might be, Your Honor. If it was a person like Mr. Gorka who was harassing people and calling him, you know, basically a fake journalist. Right. No, I'm assuming that way. So I'm assuming there is no prior interaction. And I should have been more careful, more specific. And the guest hasn't said anything to anybody. If there were no other facts, again, I don't know. I mean, it depends if it's a source and someone who had been fired from the White House because they couldn't keep their security clearance. Journalism is a rough and tumble thing. And that's why in a vacuum saying something doesn't conform to professional standards, it's very difficult. And I'll just finish what the Supreme Court has said. It's a vehement, caustic debate. That's what our system builds into our democracy. And the Booth versus Berry case, Justice O'Connor said, you know, speech that might be viewed as insulting to diplomats, that's too vague. That's too difficult to discern. And so I think that it's just very difficult to say that any particular statement in a vacuum is inconsistent with professional journalistic activity. Should journalists be civil? Yes. But sometimes when they're coming up against government officials who won't provide information to the public, they need to be tough, caustic, and vehement. And that's why it's just so dangerous to suggest some vague, open-ended professionalism standard can be wielded by the president and the press secretary to punish journalists. Okay. Thank you, Mr. Beauchamp. Unless my colleagues have any further questions, we've got your argument, and I think you will hear from Mr. Burnham for rebuttal. Thank you, Your Honor. Mr. Beauchamp, this is Jim Burnham. Mr. Beauchamp concedes that his position means that reporters get one free shot at any egregiously unprofessional misconduct that the White House has not expressly prohibited beforehand. Respectfully, nothing in due process or Sheryl requires that result. Both due process and Sheryl require that notice and an opportunity to be heard be given before the revocation and suspension, not before the conduct occurs. Here, Mr. Caron, of course, did have notice that his unprofessional conduct was banned, and his statement to the White House confirms it. Really, I could not encourage the court more strongly to read his statement to the White House, but just to give you two quick quotes, here is how Mr. Caron describes his proposal of a fight, which, again, the district court also found was a caustic joke proposing a fight. Quote, I've invited dozens of people outside the White House during the last 35 years to talk, end quote. Quote, I saw John McCain at the White House once and asked him that very same thing. Can we go outside and have a conversation, end quote. That's a JA-135. That is an utterly preposterous explanation for what Mr. Caron engaged in here, and the fact that he felt like he needed to offer it confirms all you need to know about whether he understood his conduct was inappropriate. If that were not enough, he even says in his statement that inviting someone to what he calls a WWF smackdown would be inappropriate, and so we don't need to grapple, I don't think, with these difficult questions about what would happen if the standards were dramatically expanded to capture conduct that seemed innocent or at least was arguably innocent and that no one understood was unprofessional, because here we have the person whose hard pass is being suspended telling us that a ridiculous story about what happened coupled with a concession that actually happened would have been inappropriate, and I just think that's a very important point both on the vagueness cases that Judge Srinivasan asked about at the beginning, which is that just because the standards vary, if you know you're in the heartland or you are in the heartland, you don't get to complain about people on the periphery, and also for all the questions that Judge Pillard and Judge Cato have asked about the need for ex-ante notice. But I do think it's important to note that there's no requirement in Sherrill or elsewhere for ex-ante notice. So BMW and Fox, those are cases about the government regulating the public. In the BMW case, it was about punitive damages, hundreds of millions of dollars of fines, yes, imposed through the civil context, but the court compared them to a criminal sanction. And in Fox, it was about the SEC's general regulation of entities. That is totally different from what we have here, which is a discretionary program where the government gives a very special privilege to people like Mr. Caron to come into the White House whenever they want. The last point I'd like to make... I want you to be able to make your last point so I don't forget it. Was this a press event? It was after a press event, Judge Pillard. So there was a press conference with the President, the Secretary of Commerce, the Attorney General, and then that ended. And then the events of issue sort of pick up right after that. So if you look at the video, if you review the footage, Mr. Caron shouts a question at the President, which they do all the time, nothing wrong with that. The President doesn't answer it, also very normal. And then people in the audience say, you know, I'm sorry, you know, too bad you didn't answer your question. And then Mr. Caron makes his demonic possession crack, which for the record I don't think has any analog in TV, film, or otherwise. Some people laughed, other people did not think it was so funny, and then the rest of it persists. Thank you. You had one more point you wanted to make. I did. So the only response I think to all of this that Mr. Gutierrez offers is that there's a risk of discriminatory application. And I don't think that makes sense for three very simple reasons. First, the conduct here is not journalistic conduct. So all the examples from his declarations are about reporters trying to ask questions or being tenacious in their efforts to report the news. This has nothing to do with that. This is not Mr. Caron asking questions as a reporter. That's why this is so much easier, I think, than the Acosta case, because in the Acosta case, which he and I are both very familiar with, you had potential misconduct intertwined with Mr. Acosta attempting to interrogate the President at a press conference, which, of course, is a core journalistic activity. So you don't have any of that here. So the whole First Amendment aspect is dramatically diminished. Second, if the conduct is egregiously unprofessional, and here, of course, I'm not sure I follow that because they've been invited to be there presumably as journalists, not as guests. The idea is that they're going to be reporting something, and then the reason that it is Mr. Caron who ends up being the focus of this is he's the one, as you said, who very appropriately called out Mr. President when he picked some questions. That's the beginning of when then the guests say, oh, don't be sad, don't be sad if you're not the fake news. So it is part of being present, being patient, having waited through this, being then assailed with remarks by the guests. So it is part of journalistic conduct to be sitting there trying to figure out what news opportunity do I have. So two points on that, Judge Billard. There were a lot of reporters there that day. I mean, dozens if not many, many dozens, and many of them tried to ask questions at the end of the press conference, and so Mr. Caron was not unique in that respect, and none of the other reporters who didn't have their questions answered felt like they needed to insult the gathered guests or make some kind of a response and then continue escalating over and over again the way Mr. Caron does as the footage captures. And then the second point is that the heart of what I was trying to say is that I understand what Mr. Boutros is saying if we're talking about penalizing journalists for conduct that is journalistic in nature, or at least arguably journalistic in nature. So in the Acosta case, the fight is whether, you know, what's his behavior with the microphone while engaging in journalism sufficiently egregious to be able to suspend his Harper Pass. That is much closer to the concerns Mr. Boutros has raised than this when we're talking about outside the context of a journalistic event, just behavior around the White House. And that's why I think the racial epithets and the sexual harassment and those hypotheticals have a lot of force, because these reporters are not just there during press events. They're there all the time. They have the same ability to come onto the campus that a member of the staff does, and that is a very special privilege that a very small number of people have, and that all the people who sign up for it understand comes with an obligation to be responsible and act professional while you're on the White House grounds. The last point I wanted to make, and of course I'm happy to answer any questions, is that this is just not a First Amendment case. It is a case where the First Amendment informs the application of the Fifth Amendment, but there's no First Amendment right that Mr. Karam possesses to come onto the White House grounds or to be there whenever he wants to. So it's just a procedural due process case, and I think when you think about it that way, it's quite clear that the suspension here after a lengthy, very careful process is justified. Thank you, Your Honors. Unless you have any questions, I'll be done. It sounds like there are no further questions. Mr. Burnham, Mr. Burtrous, thank you for your argument. We'll take the case under submission. Thank you.
judges: Srinivasan, Tatel, Pillard